**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 3:24-CR-189 (OAW) |
| | ) | |
| JOSHUA GLAESER, | ) | |
| *Defendant*. | ) | |
| | ) | |

**RESTITUTION ORDER**

**THIS ACTION** is before the court on the government's amended motion for a restitution order ("Motion").  ECF No. 79.  The court has reviewed the Motion[1] and all exhibits thereto.  *See* ECF Nos. 76, 77, and 79-1.   The Motion includes Defendant's position regarding restitution, and no other response or reply was filed.

I.    **BACKGROUND**

On September 26, 2024, pursuant to a plea agreement with the government, Mr. Glaeser entered a guilty plea to possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).  ECF No. 41.  He was sentenced on June 9, 2025, to imprisonment for 120 months with 15 years of supervised release to follow.  ECF No. 71. He also will be required to pay $10,000 in assessments pursuant to the Justice for Victims of Trafficking Act and the Mandatory Restitution Victims Act.  *Id.*  Restitution is mandatory for this crime, but the appropriate amount was unknown at the time of sentencing, and so

---

[1] The government also filed a motion to seal certain exhibits that contain sensitive personal information of victims.  Pursuant to Local Rule of Criminal Procedure 57(b)(3)(A), the court finds that good cause exists to seal these exhibits.  Further, the court finds that currently there is no ascertainable date by which the documents may be unsealed.  Therefore, docket entries 76 and 77 shall remain under seal until further order of the court.

the court deferred entering that portion of the sentence pursuant to 18 U.S.C. 1664(d)(5). The government has since filed the requisite information, and the parties agree that a hearing on the issue is not necessary.

## II.    <u>LEGAL STANDARD</u>

Relevant statutory authority is clear that restitution must be ordered in cases such as this to repay "the full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim."  18 U.S.C.A. § 2259(b)(2)(A).  Such losses include costs already or reasonably likely to be incurred as a proximate result of the offense of conviction, such as physical and mental healthcare, rehabilitative costs, living expenses, lost income, attorneys' fees, and "any other relevant losses incurred by the victim."  *Id.* § 2259(c)(2). However, it is equally clear that an individual convicted of trafficking in child pornography should be ordered to pay only "an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses . . . ."  *Id.* § 2259(b)(2)(B).

Even the Supreme Court of the United States has acknowledged, though, that fashioning a restitution order that satisfies all aspects of the statute is particularly difficult given the "atypical causal process underlying the losses" of a trafficking victim.  *Paroline v. United States*, 572 U.S. 434, 449 (2014).  While declining to devise a bright-line rule to govern such determinations, the Court listed a number of factors to consider:  "the continuing traffic in the victim's images[;] . . . the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's

general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role." *Id.* at 460.  This is not, however, "a precise mathematical inquiry," but rather an exercise of the court's discretion.  *Id.* at 459.  Notably, "Congress substantially amended § 2259 in response to the *Paroline* decision." *United States v. Clemens*, 990 F.3d 1127, 1129 (8th Cir. 2021).  Of particular importance, the statute now requires courts to impose restitution of at least $3,000 to each identified victim.

### III.   <u>DISCUSSION</u>

The court starts, per *Paroline*, with the individual survivors' gross economic losses, which itself presents a significant hurdle.  Disaggregating the harm caused by the initial abuse from the harm caused by subsequent trafficking in child sex abuse material ("CSAM") is difficult if not impossible.  One first must acknowledge the fiction that the creation and the viewing of CSAM are independent crimes.  The demand for CSAM certainly leads to its continued creation, incentivizing predators to perpetuate abuse for the entertainment of people like this defendant.  There being no clear indication that any of these victims' abuse was caused by this defendant's viewership, though, the court will not consider this point herein.

Instead, the court focuses on the new harm that trafficking itself inflicts.  As noted even in *Paroline*, the victim there appeared to make something of a recovery from the

initial abuse she suffered, only to be dealt a horrific setback when she realized that her trauma was being replayed by countless, faceless, nameless individuals for their sick personal enjoyment.  The trafficking itself thus also inflicts a discrete and independent harm, which illustrates that a victim's wounds can never fully heal, and that rehabilitation and treatment likely will have to continue throughout a victim's entire life, which always will be tinged with a suffering the average American cannot fathom.

In the impact statements provided by the identified survivors in this case, the court is struck by the consistent descriptions of depression, anxiety, and post-traumatic stress disorder, directly attributable to the *trafficking* in the abusive images of them.  Several letters describe some measure of recovery enjoyed by their authors, which progress was nulled entirely when they realized that they can never even pretend to forget the horrors of their abuse.  The survivors repeat the common refrain that these anonymous, depraved individuals who recreationally consume child abuse could be anyone they see on any given day.  They fear that someone could recognize them, and they have difficulty trusting others, with good reason.  Several survivors describe receiving anonymous and inappropriate communications, including links to the images of their own abuse.  Others have been stalked, and their legal names and home addresses have been circulated amongst CSAM "enthusiasts."

To combat the added insecurities presented by trafficking, survivors must invest in security systems, engage services to protect their identities, and seek medical treatment targeting the effects that the knowledge of trafficking has on their personal health.

The court therefore has no trouble accepting the calculations provided by several survivors estimating their *disaggregated* losses, though those calculations yield sums as large as nearly $7,000,000.00.

Turning to the *Paroline* factors, useful though it might be to know the degree of continuing traffic in any individual's images, it is a hallmark of CSAM that its distribution is not easily monitored, so figuring that number is impossible.  It certainly is reasonable to take as given, though, that technology will continue to advance in ways that make faster and farther distribution easier, such that the number of future offenders will increase. Indeed, and unfortunately, we currently have incomplete data indicating that there will be no slowing of the flow of CSAM through the Internet.  According to certain information the government provides, one survivor began being awarded restitution from traffickers in 2009, in which year over 35 such orders were entered.  In 2016, there were 132 such orders.  In 2024, there were 118.  This person writes that she has noticed no dwindling of the number of notices she receives related to new traffickers being charged with possession of images of her.  Several survivors have engaged attorneys to receive these notices on their behalf, because their mere receipt is counterproductive to recovery.

This information addresses to some degree the question of how many convictions have resulted in restitution orders.  Those survivors who unfortunately have over a decade of such orders, though, still have recovered only about half of their total losses, and one might expect those losses to increase as trafficking expands exponentially. Individuals like Mr. Glaeser create a market for these images by indulging a destructive appetite, even without distributing the images further (which Mr. Glaeser also did).

5

The government and Mr. Glaeser ask the court to order restitution of $3,000 per victim, the statutory minimum, citing the impossibility of determining which victim was injured more than any other, and Mr. Glaeser's likely inability ever to make any appreciable contribution to any order of restitution. But a defendant's ability to pay is not a factor appropriately considered when imposing restitution. And the court need not pit the victims against each other or somehow rank their suffering to determine their losses. Despite any similarity that one might perceive assessing each survivor's victimization, each victim is a unique individual with unique losses. The court finds it appropriate to review the asserted losses of each individual and to determine whether the total amount is supported by the record, and concludes that each survivor has shown their losses to be substantial. Further, the court finds that the amount they each request from this defendant reflects his relative responsibility for their ongoing trauma.

"Lily" seeks $10,000 in restitution from Mr. Glaeser. Despite her abuse having occurred two decades ago, individuals like Mr. Glaeser continue to traffic in images of it, rendering her harm particularly long-lived. This amount also is less than half of one percent of her well-supported total losses. The court finds this to justify the restitution she requests.

"Chelsea" asks for $5,000 in restitution. This represents less than half of one percent of her well-supported total losses. The trafficking in images of her abuse is particularly harmful to her, as she has difficulty using a computer now, which of course affects her ability to work. The court finds this to justify the restitution she requests.

"Pia" asks for $5,000 in restitution. This represents less than half of one percent of her well-supported total losses. Her abuse occurred when she was four and five years

old, meaning that she will never remember or experience any part of her life that is not tinged by her trauma.  Her youth might have worked in her favor in that she may have been able to forget those experiences, but for traffickers such as Mr. Glaeser.  The court finds this to justify the restitution she requests.

"Jan_Socks1" asks for $5,000 in restitution.  Her abuse has resulted in her removal from her parents and siblings.  The continued trafficking in her images and the continued criminal cases related thereto have required her to rely upon court-appointed professionals for all the assistance that a family otherwise would provide.  These professionals cost, and will continue to cost, substantial sums.  The court finds this to justify the restitution she requests.

"Ivy" and "Jen" each ask for $5,000 in restitution.  They also have been removed from their parents and therefore must pay for all the support that the ongoing trafficking in their images requires.  The court finds this to justify the restitution they request.

"Jenny" asks for $10,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  She has dealt with the trafficking in her images for approximately ten years, and she has received notice of hundreds of cases involving images of her abuse, which has caused ongoing trauma for her.  Despite having had traffickers of her images prosecuted for almost a decade, and having had restitution orders entered in hundreds of cases, very few of her losses have been repaid to date. The court finds this to justify the restitution she requests.

"Sarah" asks for $10,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  She has received notice of thousands of cases of traffickers dealing in the images of her abuse, and approximately 1,500 restitution

orders have been entered.  Despite this, only about half of her losses have been recovered.  The sheer volume of trafficking has led her to move out of the country entirely in an effort to insulate herself from anyone who may have seen her abuse.  The court finds this to justify the restitution she requests.

"Raven" asks for $10,000 in restitution.  She has not yet received sufficient restitution to pay for even the experts to opine on her total losses.  Despite restitution orders having been entered against traffickers of her images for seven years, the total number of such orders is small compared to other survivors, meaning that her losses must be compensated by a smaller pool of convicts.  The court finds this to justify the restitution she requests.

A survivor known only by the title of the CSAM depicting them, "Braid&Tile," has not asked for a specified amount.  The court therefore finds the statutory minimum of $3,000 to be appropriate.

"Taylor" asks for $3,000 in restitution.  This being the statutory minimum, the court finds this amount appropriate.

Another survivor known only by the title of the CSAM depicting them, "SparkingVelvet," asks for $7,500 in restitution.  This represents less than half of one percent of their well-supported total losses.  They, still a child, suffer from suicidal ideation, despite having finally found a safe home with an adoptive mother, because any sense of security has been dashed by the realization that their abuse will forever be on display online.  Their symptoms will require constant treatment for decades to come.  The court finds this to justify the restitution they request.

"Sloane" asks for $10,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  The continued trafficking in their images her resulted in her legal name being revealed online, along with recent photographs of them.  Employment has been harder for her because she cannot engage with the internet the same way others can.  The court finds this to justify the restitution she requests.

"John Doe" asks for $5,000 in restitution.  He was only five when he was abused.  He also has an intellectual disability, which presents unique healthcare needs, particularly when coupled with his abuse and the ongoing trafficking in the images of that abuse.  These challenges also make it difficult for him to be employed.  The court finds this to justify the restitution he requests.

"Aster" asks for $5,000 in restitution.  It appears that she was identified relatively recently, since prosecutions of traffickers in the CSAM depicting her only began a few years ago and she only secured an attorney in May 2025.  Further, it appears that she has not been paid enough to secure a comprehensive economic study of their losses.  The court finds this to justify the restitution they request.

"April" requests $5,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  She has requested to stop receiving direct notice of trafficking prosecutions because the number of them causes her severe distress.  Mr. Glaeser possessed 500 images of April, so his particular injury to April easily justifies the amount she requests.

"Maria" requests $7,500 in restitution.  This represents less than half of one percent of her well-supported total losses.  Despite moving across the country, she still encounters the online images of her abuse.  She copes with her new reality by isolating

9

herself to the point that she cannot attend school in person.  This likely will have far-reaching effects on her earning potential.  She also suffers from suicidal ideation.  The court finds this to justify the restitution she requests.

"Henley" requests $5,000 in restitution.  She has been invited to earn money modeling, which may have been a very lucrative path for her, but the continued trafficking in the images of her abuse made her decline the offer.  Employment and education have proved difficult for her because video technology is now commonplace in those settings, but video technology itself is a trigger for her.  She also has diverted receipt of the notices of new prosecutions involving the images of her abuse because of the deleterious effect those notices have upon her mental health.  In fact, she might choose not to receive notice at all, except that by doing so she would be ineligible for restitution, which she needs to address the costs of her ongoing trauma.  She continues to be recognized and approached by individuals who make comments that trigger a new wave of trauma response.  The court finds this to justify the restitution she requests.

"Fiona" requests $10,000 in restitution.  Fiona was only six when her abuse began, meaning she, too, faces an entire life without any period of remembered normalcy despite having little conscious memory of the actual abuse.  She also was sedated for some of the recorded abuse, which makes the viewing of this content even more depraved and invasive.  The court finds this to justify the restitution she requests.

"Jane" requests $10,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  She was given drugs by her abuser, which might otherwise have prevented her from having clear memories of the abuse, but for the continued trafficking in the images of that abuse.  She expresses fear of professional

success, because such success would make it more likely that her past will be discovered, and that deplorable people will recognize her and find her. The court finds this to justify the restitution she requests.

IV. **CONCLUSION**

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Mr. Glaeser hereby is ordered to pay a total of $133,000 in restitution to the victims so far identified, in the amounts each individual requests.

    i. The payments shall be made in accordance with statute, which normally requires an immediate lump-sum payment. However, the court already having found that Mr. Glaeser is financially unable to satisfy this portion of his sentence at this time, repayment shall be made a condition of his supervised release. Accordingly, interest shall accrue in accordance with statute.

    ii. The Defendant shall make payment to the Clerk of Court. Payment may be made in the form of cash, check or money order. All payments by check or money order shall be made payable to the "Clerk, United States District Court," and each check shall be delivered to the United States District Court, Attention: Clerk's Office, 141 Church Street, New Haven, CT 06510 as required by 18 U.S.C. § 3611. The Defendant shall write the docket number of this case on each check delivered to the Clerk's Office. Any cash payments shall be hand delivered to the Clerk's Office using exact change, and shall

not be mailed. Payments can be made through Pay.gov, using a checking or savings account (ACH) or credit, debit, and prepaid cards. Instructions on how to self-enroll and make payments online are on the court's website at: http://www.ctd.uscourts.gov/payment-information.

    iii.  The Clerk shall distribute restitution payments to the victim(s) identified in this order in accordance with the District's Standing Order on the Disbursement of Restitution Payments by the Clerk of Court.

    iv.  The government is instructed to file a chart under seal that indicates the appropriate means of delivering any restitution payments to the victims.

2. Defendant shall notify the court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, of any material change in the Defendant's economic circumstances that might affect the Defendant's ability to pay restitution in accordance with 18 U.S.C. § 3664(k).

3. Defendant shall notify the United States Probation Office (during any period of probation or supervised release) and the United States Attorney's Office of any change in address.

4. Defendant shall apply to any restitution still owed the value of any substantial resources from any source the defendant receives during the

period of incarceration, including inheritance, settlement or other judgment in accordance with 18 U.S.C. § 3664(n).

5.  Nothing in this order shall prevent the Bureau of Prisons from collecting restitution payments in accordance with its Inmate Financial Responsibility Program ("IFRP"), 28 C.F.R. § 545.10 et seq., up to the maximum amount permitted under the IFRP guidelines.

6.  The court also hereby enters a no-contact order that prevents Mr. Glaeser from ever knowingly seeking, contacting, or attempting to contact, directly or indirectly, any of the individuals depicted in the videos and images seized during this investigation.

**IT IS SO ORDERED** at Hartford, Connecticut, this 12th day of April, 2026.

_/s/_
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE